Argued at Pendleton December 18, 1945; reversed January 22, 1946

## McKINNON ET AL. *v.* BRADLEY ET AL.

(165 P. (2d) 286)

Before Belt, Chief Justice, and Kelly, Bailey, Lusk and Hay, Associate Justices.

R. R. Bullivant, of Portland (Pendergrass, Spackman & Bullivant, Charles E. Wright, and Hampson, Koerner, Young & Swett, all of Portland, and Ernest C. Smith, of Hood River, on the brief), for appellants.

Earl S. Nelson, of Portland (with John Baker and Teunis J. Wyers, District Attorney, both of Hood River, on the brief), for respondents.

HAY, J.

On December 9, 1932, Hood River Hotel Company, a corporation, to secure its promissory note for $7,500, executed in favor of the estate of Caroline A. Kamm, deceased, a mortgage upon certain real property in Hood River, Oregon, upon which was situated a building used by the mortgagor as a hotel. The note was payable three years after date and bore interest at six per cent per annum. The mortgagor expressly covenanted that it would make timely payment of all taxes which might be levied against the property. On December 14, 1932, the mortgage was duly recorded.

Caroline A. Kamm had died testate on August 6, 1932. By her will, dated June 17, 1930, she nominated Charles F. Adams and L. F. Steel to be executors

thereof and appointed them trustees to receive, hold and manage the assets of her estate from the closing of the administration thereof until five years after the date of the will. The will was duly admitted to probate in Multnomah County on August 15, 1932, and Adams and Steel were appointed executors and qualified as such. The mortgage and note above referred to appear to have been received by the executors in lieu of or as an extension of an earlier mortgage upon the same property, securing a note for $20,000. That mortgage and note were appraised at $5,000 upon the estate inventory. Upon distribution of the assets of the estate, the executors assigned the $7,500 note and mortgage to themselves as trustees. Thereafter, upon termination of the trust, they assigned the mortgage and note to the beneficiaries of the trust, who are the plaintiffs herein. It does not appear that anything was ever paid upon the original $20,000 note, and it is certain that nothing has been paid upon the $7,500 note.

On August 29, 1934, the mortgagor conveyed the mortgaged premises to the defendant G. E. Bradley. G. E. Bradley and Wm. E. Bradley, her husband, thereupon went into possession of the premises and have remained in possession ever since. This suit was instituted to foreclose the mortgage. The complaint was filed February 4, 1943. It is in the usual form in such cases, with additional allegations to the effect that Hood River County foreclosed liens for delinquent taxes upon the mortgaged premises for the years 1926, 1928, 1929 and 1930, and, by virtue of such foreclosure, procured a sheriff's deed conveying the property to it; that thereafter, one L. B. Walker, mother of defendant G. E. Bradley, entered into a written agreement with the county for the purchase of the premises,

which agreement she assigned to the defendants Wm. E. Bradley and G. E. Bradley, to whom she quitclaimed the premises; and that Mrs. Walker's dealings with the property were in furtherance of a concerted scheme for the benefit of the defendants Bradley, to procure title to the mortgaged premises free of the lien of the mortgage, in defraud of plaintiffs' rights thereunder.

The defendants Bradley filed a general denial of the allegations of the complaint. As affirmative defenses, they pleaded that the plaintiffs are estopped to maintain the suit, for the reason that Charles F. Adams and L. F. Steel, executors and trustees aforesaid, at or about the time when the county instituted the tax foreclosure proceedings, upon being requested by the Bradleys to advance such sums as might be necessary to prevent such foreclosure, informed them that "said note and mortgage was a loss to the estate of Caroline A. Kamm and that there was no security in said property for said note and mortgage, that they would not take any action to recover upon said note or to foreclose said mortgage and had no further interest in it or in said real property; and advised these defendants that they should permit the defendant Hood River County to foreclose upon said property and that by so doing said property would be cleared of the lien of said mortgage, and that the title to said property would be then free and clear of the encumbrances, provided a satisfactory purchase arrangement could be made with the defendant Hood River County; * * *"; that such statements were made by Adams and Steel with the intention and expectation that the Bradleys would rely upon them, and that the latter did rely thereon and, so relying, continued in the possession of the premises and made "large investments of time and money * * * in attempting to save and salvage said

property and the investment therein * * *", and purchased the property from the county, paying therefor "large sums of money"; and that, by reason of the industry and investment of the Bradleys, the value of the property has been increased, and plaintiffs are seeking to take an inequitable advantage of such increase in value. They allege further that no demand was ever made upon them for payment of the note or for performance of any of the conditions of the mortgage; that plaintiffs have been guilty of laches, and that their "claim to foreclose said mortgage is stale and barred by the Statute of Limitations". Issue was joined upon these affirmative defenses.

The circuit court, after a hearing, sustained the defenses of estoppel and laches and dismissed the complaint. Plaintiffs appealed.

Appellants contend that the court erred in sustaining the plea of estoppel. Mr. Adams and Mr. Steel were appointed executors of the estate on August 15, 1932. The trust set up by the will was to terminate in five years from the date of the will. The will was dated June 17, 1930, and hence the trust terminated June 17, 1935. On March 21, 1934, the final account of the executors was approved, and they were ordered to transfer all property of the estate remaining in their hands to themselves as trustees. This was done, and on May 28, 1934, the probate court made an order settling the final account of the executors and discharging them.

G. E. Bradley defended against the tax foreclosure. Her husband, Wm. E. Bradley, testified that, immediately after the circuit court announced its decision against Mrs. Bradley and in favor of the county in the tax foreclosure proceedings, he went to Portland to confer with Mr. Steel in connection therewith. As the

court's memorandum opinion in the foreclosure case was dated August 31, 1935, it may be assumed that Mr. Bradley's visit to Portland took place not earlier than the fore part of September of that year. He testified further that Mr. Steel promised to go to Hood River to look into the situation, and that sometime in the first half of September, he and Mr. Adams visited Hood River for that purpose. Although the trust was to have terminated June 17, 1935, we will assume for the purposes of this discussion that, in September, the trustees still had possession of the trust property and were acting as trustees. Mr. Bradley admitted that he knew that they were acting in the premises either as executors or as trustees. He was endeavoring to persuade them to advance moneys to prevent the mortgaged property from being sold under the tax foreclosure proceedings. They refused to do so, but stated that they would not take any action to recover on the note or to foreclose the mortgage. They advised Bradley to permit the county to foreclose its tax liens, and said that such foreclosure would free the property from the lien of the mortgage, and that the Bradleys, if thereafter they could purchase the property from the county, would become the owners of an unencumbered title thereto. Prior to this time, Mr. Bradley had had a number of discussions with Mr. Steel in Portland relative to the mortgage and the impending tax foreclosure, and, on one of these occasions, he claimed to have met Mr. Adams in Mr. Steel's office.

██ The only evidence before us with respect to the alleged representations made by Mr. Steel and Mr. Adams is the testimony of Mr. and Mrs. Bradley, as both Mr. Steel and Mr. Adams died before the hearing. Assuming that the representations were actually made,

52

it is clear that they were not binding upon the beneficiaries of the trust. Mrs. Kamm's will gave no authority either to the executors or to the trustees to relinquish or surrender estate or trust assets without consideration, and they had no authority to do so. 65 C. J., Trusts, section 554, p. 688; 3 Bogert, Trusts and Trustees, section 592, p. 1869; Restatement, Trusts, section 322, p. 960; *Abell v. Brown,* 55 Md. 217, 220-1.

"It is beyond our comprehension why such a complete surrender should have been made. But it is quite plain that the trustee had no power to make it, and that as to these *cestuis que trustent* the consent judgment is null and void. The trustee had no more power to convey the estate of his *cestuis que trustent* in that manner than he would have to convey it by a deed in fee. A guardian cannot convey away his ward's estate except by proper legal proceedings, and this trustee is bound by similar limitations, as he was vested with no such power either by legal decree or by the terms of the trust."

*Belcher v. Cobb,* 169 N. C. 689, 694, 86 S. E. 600.

■ The duty of a trustee in this connection has been stated by this court in *Boehmer v. Silvestone,* 95 Or. 154, 170, 174 P. 1176, 186 P. 26, 30, as follows:

" 'His duty is to manage the property for his *cestui que trust,* and not to keep his conscience, or betray his title or interests; and he can make no admissions prejudicial to the rights of his *cestui que trust,* nor can he use his influence to defeat the purposes of the trust as declared by the creator of it': 1 Perry on Trusts, § 433."

The same rule is applicable to executors. 33 C. J. S., Executors and Administrators, section 181, p. 1156; *Dealy v. Shepherd,* 54 Tex. Civ. App. 80, 116 S. W. 638, 640; *Stuart's ex'ors v. Abbott,* 9 Gratt, (Va.) 252, 253-4.

■ Having been aware of the fact that they were dealing with trustees, the Bradleys were put upon notice of the terms of the trust, including the extent of and limitations upon the trustees' powers. 3 Bogert, Trusts and Trustees, section 565; *Schramm v. U. S. Nat. Bank of Portland,* 151 Or. 693, 704, 52 P. (2d) 181.

■ It is in evidence that, in December, 1935, Mr. David B. Simpson, who was at that time in charge of real properties for the Kamm interests, accompanied by Mr. Jacob Kamm, one of the plaintiffs herein, visited Hood River and called upon Mr. and Mrs. Bradley at the hotel. On this occasion, Mr. Simpson, as he testified, inquired of Mr. Bradley what price the latter would place upon the hotel equipment, and also what rent he would be willing to pay for the hotel, in the event that the Kamm interests should take over the property. In his memorandum opinion herein, the trial judge stated that the Bradleys may have been mistaken in thinking that the representations upon which they claim to have relied were made to them by Steel and Adams, and suggested that, in fact, they may have been made by Simpson and Kamm. We think that this is quite improbable. Bradley, having had several conversations with Mr. Steel prior to the time when Steel and Adams came to Hood River, could hardly have mistaken either Mr. Simpson or Mr. Kamm for Mr. Steel. Moreover, at the hearing of this case, both Mr. and Mrs. Bradley, while on the witness stand, upon having their attention directed to Mr. Simpson and Mr. Kamm, positively denied ever having met them or conversed with them at any time. Despite such denials, however, we are satisfied that Mr. Simpson and Mr. Kamm did call upon the Bradleys at Hood River in December, 1935, and that on that occasion Mr. Simpson had a conversation with Mr. Bradley as heretofore stated.

Both Mr. Simpson and Mr. Kamm denied that either of them made any such representations to the Bradleys as the latter attributed to Mr. Steel and Mr. Adams. Respondents made no claim, either in their pleadings or at the hearing, that the representations were made by Simpson or Kamm, although their counsel have suggested it on brief in this court. Our own conclusion upon the evidence is that no such representations were made by Simpson or Kamm.

Respondents insist that, through the purchase of the mortgaged property from the county by Mrs. Walker, and her subsequent quitclaim to them, they became the owners thereof free from the lien of the mortgage. Appellants, to the contrary, assert that neither a mortgagor nor his successor can destroy a mortgage lien by any such means. The scheme, they say, effected merely a payment of the taxes, leaving the title to the property in the same condition as though no tax sale had been made.

■■ In support of their position, respondents rely upon sections 110-920, 110-925 and 110-926, O. C. L. A. By section 110-920, O. C. L. A., it is provided that any judgment and decree for the sale of real property to a county on foreclosure for delinquent taxes shall be conclusive evidence, in all collateral proceedings, of its own regularity and validity. As the regularity of the tax foreclosure proceedings is not before us on this appeal, this section does not appear to be in point. Neither is section 110-926, O. C. L. A., by which the legislature undertook to validate all sales of lands for delinquent taxes made to counties or other public corporations. Section 110-925, O. C. L. A., provides that whenever a county shall have acquired real property by foreclosure for delinquent taxes, the conveyance "shall vest in said county title to said property, free

from all liens and incumbrances''. Respondents say that this section has the effect of making the county's title impregnable as against mortgage liens. Appellants do not suggest, however, that title to the property in this case, freed of the lien of the mortgage, did not vest in the county, or that, if the county had conveyed the property to a stranger, he would not have taken an unencumbered estate. We are of the opinion that section 110-925, O. C. L. A., was not intended to operate as a means whereby a mortgagor or his successor could defeat the lien of a mortgage upon his real property by the simple device of permitting the county to acquire the property under a tax foreclosure proceeding, and then, either directly or mediately, resuming the legal title thereto. By the great weight of authority, regardless of the fact that the county became owner of the premises freed from the mortgage lien, and irrespective of whether or not Mrs. Walker was a bona fide purchaser, the subsequent revesting of the title in a grantee of the original mortgagor worked an equitable redemption of the property for the benefit of the mortgagee, and the mortgage lien was restored. *Torreyson v. Dutton,* 137 Fla. 683, 188 So. 805, 190 So. 430.

The following is a clear statement of the rule in such cases:

"It is a general principle of law that one who by virtue of an existing legal or contractual relation with another is under an obligation to such other person to pay the taxes on lands, but who omits to pay such taxes, cannot be allowed to strengthen his title to such land by buying in the tax title when the property is sold as a consequence of his omission to pay the taxes on it; his purchase at the sale will merely operate as a payment of the taxes, and the title will be the same as it was before the sale, except that the lien for taxes is discharged. *This*

*rule includes those whose duty it is to pay the taxes or who have such an interest in the property that they might redeem the same from tax sale and save themselves from loss and injury,* or those lien holders who may pay the taxes and are given a preferred lien over other lien holders and the title holder for the amount of the taxes paid. One who acquires property through or under a tax sale proceeding in violation of this principle and whose title may for this reason be defeated at the instance of those for whose protection the rule was devised cannot cut off the latter's rights by conveying the property to a third person, even though he may be a bona fide purchaser.

*"The effect of the principle which precludes one under obligation to pay taxes from becoming the purchaser at a sale for delinquency in payment of taxes cannot be evaded by such person by allowing the property to be sold to a third person and then purchasing it from him,* by organizing a corporation and causing the tax deed to be made to it, or by any other collusive arrangement which would directly or indirectly defeat the operation of the rule.'' (Italics ours.)

51 Am. Jur., Taxation, section 1054.

It is true that Mrs. Bradley did not personally assume the mortgage when she purchased the premises from the original mortgagor. However, she did have such an interest in the property that she might have redeemed it from the tax sale. Section 69-818, Oregon Code 1930. Despite the intrusion of Mrs. Walker into the chain of title, the Bradleys remained in possession at all times. The sum paid to the county for the property was exactly the amount of delinquent taxes with interest and costs of foreclosure.

The Oregon cases are in accord with the general rule.

"The law is well settled that a mortgagor, *or his successor in interest, remaining in possession of the land,* cannot permit the mortgaged property to be sold for taxes, and become the purchaser thereof, either directly or through the agency of another, for the purpose of cutting off a prior lien. He is under a legal obligation to pay the taxes, and cannot, by neglecting to perform this duty, and suffering the land to be sold in consequence of such neglect, add to or strengthen his title by purchasing at the sale himself, or by subsequently buying from a stranger who purchased thereat. By such a purchase he does not acquire, as against the lien-holder, any title or right to the property better than he had before, but the sale will operate only as a mode of paying the taxes, leaving the title in the same condition as if no sale had been made. * * *" (Italics ours.)

*Nickum v. Gaston,* 24 Or. 380, 384, 33 P. 671, 35 P. 31.

In the case of *Union Central Life Ins. Co. v. Parks,* 134 Or. 144, 292 P. 304, the facts were that defendant Parks had borrowed money of plaintiff, and had given promissory notes therefor, secured by a mortgage of real property. While the mortgage was still outstanding, the county in which the mortgaged land was situated foreclosed its lien thereon for delinquent taxes. The land was purchased by the county, which received a sheriff's deed therefor on January 25, 1926. On August 26, 1927, the mortgagors quitclaimed to one Uriaguereca, to whom, on September 7, 1927, the county conveyed the land. Thereafter, the mortgagee brought suit to foreclose its mortgage. Uriaguereca defended on the ground, inter alia, that he purchased the land from the county in good faith and for a valuable consideration, and was the sole and legal owner and in possession thereof. The court sustained a general demurrer to this affirmative defense, and, on

appeal, this court affirmed, upon the authority of *Nickum v. Gaston,* supra (24 Or. 380, 33 P. 671). That part of section 110-925, O. C. L. A., upon which respondents rely was the law of Oregon (section 4348, Or. L., as amended by chapter 203, G. L., 1925) when the Parks case was decided.

*Zuege v. Nebraska Mortgage Company,* 92 Kan. 272, 140 P. 855, 52 L. R. A. (N. S.) 877, is the only case we have been able to find which is contrary to the weight of authority upon this point as stated above. The court's holding therein is succinctly stated in the syllabus as follows:

> "Where one takes a deed to land which is encumbered by a mortgage, but does not assume or agree to pay the mortgage, no personal relation or obligation subsists between him and the holder of the mortgage, and he owes no duty to the holder of the mortgage to pay the taxes on the land, and may thereafter acquire a tax deed to the land which will extinguish the rights of the mortgage holder therein if the land be not redeemed and no action be brought by the holder of the mortgage to set aside the tax deed within five years from the issuance thereof."

Commenting upon that case, the editors of L. R. A. say:

> "Zuege v. Nebraska Mortg. Co., above reported, appears to be against the great weight of authority in sustaining the right of the owner of the equity of redemption to acquire a tax title to defeat the lien of the mortgage."

52 L. R. A. (N. S.) 878.

■■ The mortgage contained an express covenant to pay the taxes. Such a covenant runs with the land. *Waring v. The National Savings & Trust Co.,* 138 Md. 367, 114 A. 57. Mrs. Bradley cannot be permitted to

take advantage of her failure to perform such covenant and thereby to strengthen her title to the mortgaged property. *Allison, Ex'r, v. Armstrong,* 28 Minn. 276, 41 Am. Rep. 281, 9 N. W. 806, 808; *Washington Loan and Trust Co. v. McKenzie,* 64 Minn. 273, 66 N. W. 976; *Waring v. The National Savings & Trust Co.,* supra; 2 Jones on Mortgages, 8 ed., section 841; Annotations, 16 L. R. A. (N. S.) pp. 122, 123, 124; Annotation, 134 A. L. R., p. 306.

The defense of laches is argued strenuously by respondents. They insist that there is no proof whatever of any conspiracy between Mrs. Walker and them to defraud appellants by depriving them of their rights under the mortgage. They say that there is no suggestion in the record that Mrs. Walker's purchase from the county was made for the benefit of the Bradleys, but that, on the contrary, the evidence is that Mrs. Walker herself had a substantial financial interest in the property. They say further that, in 1935, business conditions were greatly depressed, and they point out that there is some evidence in the record that at that time this hotel property was not worth more than the amount of outstanding taxes against it. Reiterating their claim that Steel and Adams (or Simpson and Kamm) had assured them that the Kamm interests would take no steps to enforce collection of the mortgage indebtedness, they assert that, in reliance upon such assurance, they devoted many years to the operation of the hotel, expended large sums for maintenance and repairs, and not only relieved the property from the burden of delinquent taxes, but also paid the taxes which subsequently accrued. They contend earnestly that, under all the circumstances, had they not relied upon such assurance, they would not have expended their time and money in such strenuous efforts to hold

60

on to the property. They feel that the Kamms' conduct, in standing by for nearly eight years, with full knowledge of the circumstances, without even once demanding payment of either principal or interest upon the mortgage debt, constituted laches sufficient to bar their right to maintain this suit.

Of course, laches can hardly be founded upon the purported assurances by Steel and Adams as trustees, for, as we have stated, such assurances were not binding upon the beneficiaries of the trust. Whether or not there was a fraudulent conspiracy between the Bradleys and Mrs. Walker is, we think, immaterial. In any event, the factual situation falls short of establishing laches. It is not clear that the Bradleys acted in reliance upon the representations made by the trustees, as set forth in the answer. Had they done so, it seems probable that they would have taken title from the county directly to themselves, rather than to Mrs. Walker. Moreover, immediately after Mrs. Walker (through Mr. Bradley) had contracted with the county for the purchase of the property, which was on February 5, 1936, she conveyed it to the Bradleys by quitclaim deed dated February 10, 1936, but they withheld this deed from record until December 7, 1942, which was less than two months before the complaint herein was filed. The mortgagees had no notice that Mrs. Walker was not a bona fide purchaser. The circumstances appear to indicate that the Bradleys used Mrs. Walker's name to conceal the fact that they themselves were the real purchasers. Mrs. Walker died before the hearing of the case.

If, as respondents insist, Mrs. Walker had a substantial financial interest in the property, which she was trying to protect, it is apparent that such interest was inferior to the lien of appellants' mortgage. She

was, therefore, attempting to strengthen a *secret* interest in the property by using the tax foreclosure proceedings to shake off the prior lien of appellants' mortgage. A legal owner cannot avail himself of such a scheme, and, *a fortiori,* an equitable owner may not do so.

 Equity will not lend its aid to the enforcement of stale demands, and, as a general rule, whether or not the defense of laches may be sustained depends upon the circumstances of each case. Where, however, a special statute of limitations governs the foreclosure of mortgages, the equitable principle of laches is not applicable to delay in foreclosure short of the statutory period. By sections 68-111 and 68-112, O. C. L. A., the duration of the lien of a mortgage upon real property is confined to ten years from the date of the maturity of the obligation of indebtedness secured thereby, and the maintenance thereafter of any action, suit or other proceeding for the foreclosure of such mortgage is prohibited. See *Cross v. Allen,* 141 U. S. 528, 537, 35 L. Ed. 843, 12 S. Ct. 67; *Ludwig v. Murphy,* 143 Cal. 473, 475, 77 P. 150; *Richey v. Sinclair,* 167 Ill. 184, 195, 47 N. E. 364; *Waring v. The National Savings & Trust Co.,* supra (138 Md. 367, 114 A. 57). From *Cross v. Allen,* supra, we quote:

> "The question of laches and staleness of claim virtually falls with that of the defense of the statute of limitations. So long as the demands secured were not barred by the statute of limitations there could be no laches in prosecuting a suit upon the mortgages to enforce those demands. The mortgage is virtually a security for the debt, and an incident of it. Ewell v. Daggs, 108 U. S. 143. * * *"

 In any event, mere delay in instituting the suit did not, of itself, constitute laches. It was in-

cumbent upon the defendants to plead and prove that they suffered detriment by reason of the delay. *May v. Roberts,* 133 Or. 643, 659, 286 P. 546. There was, we think, an insufficient showing on the part of the Bradleys that they actually suffered detriment in the premises. It is true that, in effect, they paid the taxes, but this was no more than they were obliged to do if they wished to retain their ownership in the property. It is also true, no doubt, that they expended considerable time and an indeterminate amount of money in maintaining and operating the hotel between February 5, 1936, when Mrs. Walker purchased the property from the county, and February 4, 1943, when the complaint herein was filed. There was no showing, however, as to what profits they may have made by such operation, and there is certainly no showing that they operated at a loss. The most that can be said for their contentions in this regard is that the evidence indicates that, for nearly eight years, the Kamms made no effort to enforce collection of the mortgage indebtedness. It may be, however, that during that period the Kamms considered that business conditions were such that collection was impossible, and that foreclosure of their mortgage would have left them with a "white elephant" on their hands. They had the undoubted right, if they chose, to wait until conditions improved to the extent that the Bradleys might be in a position to pay the mortgage indebtedness, or that the mortgage might be foreclosed with some advantage to the mortgagees. While it must be conceded that the Bradleys sustained a heavy burden in maintaining and operating the property through the lean years, it cannot be said that they suffered any detriment thereby, in the sense for which they are contending. Nor does the evidence indicate that they were injuriously affected by the

delay. *City of Pendleton v. Holman,* 177 Or. 532, 164 P. (2d) 434.

We are of the opinion that, in sustaining the affirmative defenses in this case, the court erred. The decree will be reversed, and the cause remanded with directions to enter a decree foreclosing plaintiffs' mortgage in accordance with the prayer of their complaint. No costs will be allowed in this court.